# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

EDWARD S. KUCHINSKAS,

        Petitioner,

    v.                                    Case No. 16-CV-1054

DAN WINKLESKI,[1]

        Respondent.

## REPORT AND RECOMMENDATION

### 1. Facts and Procedural History

On the morning of July 10, 2010, nine-week-old O.K. was rushed from his home to Children's Hospital of Wisconsin. Doctors there diagnosed O.K. with extensive physical injuries: bruises on his back, thigh, knee, groin, and both sides of his head (ECF No. 8-13 at 47-48, 51, 53); a skull fracture (ECF No. 8-13 at 54); 22 separate rib fractures, with some ribs being broken more than once (ECF No. 8-13 at 58); a broken leg (ECF No. 8-13 at 59); bleeding between his brain and skull (ECF No. 8-13 at 60); extensive retinal hemorrhages

---

[1] Kuchinskas is incarcerated at the New Lisbon Correctional Institution. *See* Offender Locator, Wisconsin Department of Corrections, available at https://appsdoc.wi.gov/lop/detail.do (last visited Aug. 1, 2019). The warden of this institution is Dan Winkleski. *See* https://doc.wi.gov/Pages/OffenderInformation/Adult Institutions/NewLisbonCorrectionalInstitution.aspx. Therefore, in accordance with Rule 2(a) of the Rules Governing Section 2254 Cases and Fed. R. Civ. P. 25(d), the caption is updated accordingly.

(ECF No. 8-13 at 62); two lacerations to his liver (ECF No. 8-13 at 66); and his optic nerve was disconnected, resulting in blindness in his right eye (ECF No. 8-13 at 63). A physician with expertise in child abuse (ECF No. 8-13 at 45) concluded that O.K.'s injuries must have resulted from abuse. (ECF No. 8-13 at 64.)

Erin Sabady, O.K.'s mother, took care of him 90 to 95 percent of the time. (ECF Nos. 8-11 at 14, 85; 8-13 at 5.) Covering much of the remainder of the time was O.K.'s father, Edward Kuchinskas. Also living with Sabady and Kuchinskas were their friend, Steve Stessl, who would occasionally watch O.K., and Beverly Kehoss, Kuchinskas's grandmother.

On the evening of July 9, 2010, Sabady, Kuchinskas, and Kehoss went shopping with O.K. Later that evening, Kuchinskas offered to take care of O.K. so Sabady could get some sleep. O.K. had not been sleeping the last three days and, consequently, neither had Sabady. (ECF No. 8-13 at 8-9.) At about 10:30 P.M., a neighbor was awoken by the sounds of O.K. screaming: "Very short, shrill at the top of the lungs screams. Not like a cry. Just short bursts of loud, shrill screams." (ECF No. 8-10 at 40.) He looked out his window and saw Kuchinskas with O.K. outside their home. (ECF No. 8-10 at 41.) At about 1:30 A.M., the neighbor was again awoken by O.K.'s screams and again looked outside to see Kuchinskas with O.K. (ECF No. 8-10 at 43.) And again at about 3:30 A.M. the neighbor awoke to O.K.'s screams and saw Kuchinskas outside with O.K. (ECF No. 8-10 at 43.)

Between 5:00 A.M. and 6:00 A.M., Sabady awoke and saw Kuchinskas and O.K. asleep in the living room. Sabady went outside to smoke. When Stessl came home, he joined her. Soon thereafter, Sabady heard O.K. start to cry and went inside. An alarm on a breathing monitor O.K. wore was going off. Sabady saw Kuchinskas standing over O.K., panicked, trying to figure out what was wrong with O.K. They then realized that the cord connecting the sensor to the monitor had become disconnected, causing the alarm to go off. (ECF No. 8-11 at 34.) Sabady observed that O.K. looked very pale, was having difficulty breathing, and was making a grunting sound. (ECF No. 8-11 at 40.) Although his eyes were open, they were fixed and unreactive. (ECF No. 8-11 at 40-41.)

Sabady wanted to call 911, but Kuchinskas was reluctant. Although panicked, begging O.K. to get better, Kuchinskas wanted Sabady to wait to see if O.K. would improve. Eventually, Kuchinskas told Sabady that he fell with O.K. (ECF No. 8-11 at 42.) Kuchinskas told Sabady that he was concerned they would be blamed for hurting O.K. and that O.K. would be taken away from them. According to Sabady, Kuchinskas said, "They're going to say that, you know, we're drug addicts; and they're going to try and say I was high." (ECF No. 8-11 at 43.)

After first calling her mother, who lived nearby, Sabady called 911. According to Sabady, Kuchinskas refused to be present when the paramedics arrived and instead "went into his grandma's bedroom and hid." (ECF No. 8-11 at 44.)

Medical personnel at Children's Hospital notified the police of their suspicions of child abuse. Police investigated, recovering bloody baby linens from the home and speaking with the members of the household. All denied intentionally injuring O.K. However, Kuchinskas acknowledged that on July 5, 2010, he was bathing O.K. in a sink when O.K. slipped from his hands and fell, landing so that he straddled the divider in the sink. (ECF No. 8-13 at 17, 51-52.) Kuchinskas also again said that he fell with O.K. on the morning of July 10, 2010. (ECF No. 8-13 at 36.) Kuchinskas reported that O.K. fell first, maybe striking his head on a rocking chair, landing on the carpeted floor, and then Kuchinskas landed on top of O.K. with his hand on O.K.'s chest. (ECF Nos. 8-13 at 47; 8-14 at 41-42.)

A physician, Dr. Angela Rabbit, opined that nearly all of O.K.'s injuries occurred no more than 10 days before his admission to the hospital and could have happened very recently—within hours. (ECF No. 8-13 at 57-59.) The only exception was a single rib fracture that probably occurred at least a week prior. (ECF No. 8-13 at 58-59.)

The state charged Kuchinskas with two counts of child abuse – intentionally causing great bodily harm, and one count of neglecting a child resulting in great bodily harm. (ECF No. 1-1.) Following a jury trial at which his defense was that someone else must have abused O.K., Kuchinskas was found guilty and sentenced to a total term of incarceration of 36 years—25 years of initial confinement and 11 years of extended supervision. (ECF No. 8-1 at 1.)

Kuchinskas unsuccessfully appealed (ECF No. 1-3) and the Wisconsin Supreme Court denied review (ECF No. 8-3). He argued on appeal and he argues before this court that he was unconstitutionally denied the right to present a defense when he was prevented from introducing evidence that O.K. suffered from neonatal abstinence syndrome (i.e., drug withdrawal) following his birth, and that Sabady reported to a detective that she used drugs five times in the two months following O.K.'s birth. The court has no further details on Sabady's reported drug use, including when any specific use occurred. Kuchinskas also argues his trial counsel was ineffective for not again trying to introduce this evidence when he alleges the door was opened to its admission.

2. **Legal Standard**

A federal court may consider habeas relief for a petitioner in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Following the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court generally may grant habeas relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Miller v. Smith*, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. § 2254(d)(1), (2)).

Kuchinskas argues for the first time in reply that the court should apply the pre-AEDPA standard set forth in 28 U.S.C. § 2243 (ECF No. 13 at 1-2), which applies "[w]hen 'no state court has squarely addressed the merits' of a habeas claim," *Morales v. Johnson*, 659 F.3d 588, 599 (7th Cir. 2011) (quoting *Kerr v. Thurmer*, 639 F.3d 315, 326 (7th Cir. 2011)). This standard is more generous to the petitioner than that imposed under AEDPA but is nonetheless deferential to the decision of the state court. *Id.*

It is a "low threshold [that] a state court decision must meet to qualify as 'on the merits' under AEDPA." *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012). "The state court need not explain its reasoning in rejecting the petitioner's federal claim. Nor must it cite or even be aware of any particular cases. Sometimes even saying nothing at all will suffice." *Id.* (citations omitted). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 624 (quoting *Harrington v. Richter*, 562 U.S. 86, 99 (2011)).

The pre-AEDPA standard of § 2243 has been generally reserved for instances in which the state court rejected the claim on procedural grounds, *see, e.g., Cone v. Bell*, 556 U.S. 449, 472 (2009), in which the state court did not address all elements of the constitutional analysis, *see, e.g., Porter v. McCollum*, 558 U.S. 30, 39 (2009), or in which the state court wholly overlooked a properly presented constitutional claim, *see, e.g., Harris*, 698 F.3d at 624-26.

6

The court of appeals acknowledged and analyzed Kuchinskas's constitutional claims. (*See, e.g.*, ECF No. 1-3, ¶¶ 17, 30.) Granted, the court of appeals did not cite any decision of the United States Supreme Court with respect to Kuchinskas's right-to-present-a-defense claim. Rather, the court of appeals relied on decisions of the Wisconsin Supreme Court, which in turn applied the applicable federal constitutional standards. That is sufficient to require this court apply AEDPA's deferential standard of review to Kuchinskas's claims.

3. Analysis

   a. **Right to Present a Defense**

Sabady was a drug addict whose prenatal use resulted in O.K. being born addicted to opiates and spending his first month of life in a neonatal intensive care unit suffering from withdrawal. The circuit court refused Kuchinskas's efforts to present this evidence to the jury. However, the jury did learn that Kuchinskas was a drug addict and high when he cared for O.K., including when he reportedly dropped O.K. while bathing him.

Kuchinskas argues this left the jury with a skewed view of the facts. He argues that the evidence of Sabady's drug use was relevant because it related to her ability to recall events, suggested a motive for offering testimony that would incriminate Kuchinskas, and could indicate that Sabady may have been capable of harming O.K. without remembering doing so. (ECF No. 2 at 14.) He further argues that the court of appeals' rejection of his argument about Sabady's drug use was based on an erroneous assumption

that the relevant abuse occurred only during the period shortly before O.K. was hospitalized. (ECF No. 2 at 13-15.)

A defendant's Sixth Amendment guarantee "to be confronted with the witnesses against him" "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). It includes the right to cross-examine those witnesses and to test "the believability of a witness and the truth of his testimony." *Id.* at 316. This may include an "attack on the witness' credibility … effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* Moreover, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324, (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

"It's well established, however, that the constitutional rights to cross-examine witnesses and present relevant testimony are not absolute; these rights 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Sarfraz v. Smith*, 885 F.3d 1029, 1037 (7th Cir. 2018) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). Therefore, trial judges may "exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues,

or potential to mislead the jury." *Sarfraz*, 885 F.3d at 1037 (quoting *Holmes*, 547 U.S. at 326). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "But restrictions on a criminal defendant's right to cross-examine adverse witnesses and present evidence in his own defense 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Sarfraz*, 885 F.3d at 1037 (quoting *Michigan v. Lucas*, 500 U.S. 145, 151 (1991)).

The court of appeals noted that many of Kuchinskas's arguments about the relevance of Sabady's drug use were vague and undeveloped. But it noted that, in Wisconsin, "the mere fact a witness upon occasion becomes drunk would not affect his [or her] credibility." (ECF No. 1-3, ¶ 21 (quoting *Chapin v. State*, 78 Wis. 2d 346, 355, 254 N.W.2d 286 (1977)).) Only if there is evidence that the witness was intoxicated at the relevant time is such evidence admissible. (ECF No. 1-3, ¶ 21.) Kuchinskas proffered no evidence that Sabady was using drugs during the period when O.K.'s injuries (according to Dr. Rabbit) were inflicted.

The court of appeals also concluded that the fact that Sabady used drugs was not relevant to whether she had the opportunity to injure O.K, nor did it provide her with a motive for injuring O.K. The court concluded that the evidence of drug use was "[m]ere

9

propensity evidence" that was "not legally or logically relevant to the crime charged." (ECF No. 1-3, ¶ 25 (quoting *State v. Muckerheide*, 2007 WI 5, ¶ 29, 298 Wis. 2d 553, 725 N.W.2d 930).) The court also rejected Kuchinskas's argument that Sabady's drug use was necessary to provide context to the crimes. (ECF No. 1-3, ¶ 26.) Finally, the court found that, even if the circuit court erred, the error was harmless. (ECF No. 1-3, ¶¶ 27-28.)

Having reviewed the record, the court finds that the court of appeals' conclusion was not an unreasonable application of federal law as determined by the United States Supreme Court. Nor was it based on an unreasonable determination of the facts in light of the evidence presented.

Kuchinskas argues that he should have been allowed to offer evidence of Sabady's drug use, both before and after O.K. was born, and the fact that O.K. suffered from withdrawal following birth. However, he never explains how Sabady's prenatal drug use was relevant; he simply tacks it on to his argument that he should have been allowed to introduce evidence of her post-natal drug use. But it was not as if there was evidence that O.K.'s injuries were plausibly attributable to Sabady's prenatal drug use. Not only was the evidence of prenatal drug use irrelevant, but it posed the obvious and substantial risk of misleading the jury and confusing the issues. The circuit court reasonably excluded it. The remaining question is whether it was reasonable to also exclude evidence of Sabady's drug use after O.K. was born.

Skipping ahead to the second count in the information, which related to O.K.'s head and eye injuries (ECF No. 8-15 at 27), Kuchinskas has failed to demonstrate that Sabady's drug use was relevant to his defense. The state presented evidence that O.K.'s eye injuries likely occurred in the roughly 12-hour period following the family's trip to Sam's Club on July 9, during which O.K. was observed seeming to notice the ceiling lights. That would not have been possible if O.K.'s eye had been injured. This timing is reinforced by Kuchinskas's explanation for O.K.'s head injuries—that O.K. struck his head on a rocking chair when Kuchinskas dropped him on the morning of July 10. There is no evidence that Sabady used drugs after the trip to Sam's Club.

However, the state was unable to similarly narrow down when the injuries that led to count one—the broken ribs and lacerated liver—occurred. (ECF No. 8-15 at 27.) A physician testified that all but one of the rib fractures occurred no more than 10 days before July 10, 2010. It could have been hours; it could have been over a week. (ECF No. 8-13 at 58.) One rib fracture was at least a week old. (ECF No. 8-13 at 58.) The state did not offer any evidence as to when the liver laceration may have occurred, but the implication was that it occurred in conjunction with the rib fractures.

Although Dr. Rabbit testified that the injuries *could* be over a week old—they simply could not be dated any more specifically—there is little to suggest that O.K.'s thoracic injuries actually occurred any earlier than the night of July 9. Aside from his difficulties sleeping, there is no evidence that O.K. was in any distress prior to the evening

of July 9. It was only then that Kuchinskas's neighbor noted O.K.'s screams. (ECF No. 8-10 at 40.) And it was only on the morning of July 10 that Sabady heard a popping sound in O.K.'s chest, his grunts, and observed his apparent difficulty breathing. This supports the inference that the injuries that led to count one also occurred in the late evening of July 9 or early morning of July 10, when O.K. was in the care of Kuchinskas. Further supporting this inference is Kuchinskas's admission that, on the morning of July 10, he tripped, dropped O.K., resulting in O.K's head hitting a chair, after which Kuchinskas fell on top of him.

Against this backdrop, where there is no evidence that O.K.'s injuries occurred at a time other than when he was in Kuchinskas's care—merely the possibility that they could have—the fact that Sabady used drugs five times since O.K.'s birth (*see* ECF No. 8-10 at 27) was of, at best, minimal relevance. Balanced against the risks of misleading the jury and confusing the issues, it was reasonable for the circuit court to prohibit Kuchinskas from introducing the evidence. Notably, it was not as if the jury was left with the impression that Kuchinskas alone used drugs. After all, the jury heard Kuchinskas's statement, "…*we're* drug addicts." (ECF No. 8-11 at 43 (emphasis added).)

Finally, the court cannot discern how Sabady's drug use was plausibly relevant to the child neglect offense charged in count three, which related to Kuchinskas delay in seeking treatment for O.K.

In sum, excluding evidence that Sabady used drugs prior to giving birth to O.K. and five times over the two months following O.K.'s birth did not unconstitutionally deny Kuchinskas his right to present a defense.

### b. Effective Assistance of Counsel

Kuchinskas argues that his trial counsel was ineffective because he failed to renew his effort to present evidence of Sabady's drug use after the "door was opened." (ECF No. 2 at 15-16.) He points to three specific instances where he argues that door was opened:

> (1) when Sabady and Stessl testified about Kuchinskas's reluctance to call paramedics because he was concerned that the police would think "we did it because we are drug addicts"; (2) when, during Sabady's redirect, the state asked Sabady if she recalled everything she told the detective; and (3) when Dr. Rabbitt testified that mild developmental delays can occur in children who have been physically abused.

(ECF No. 2 at 16 (internal citations omitted.) He also contends that his trial counsel was ineffective for not arguing that Sabady's drug use was admissible "to demonstrate motive and opportunity, and to provide context …." (ECF No. 2 at 16.)

The court of appeals stated:

> "The curative admissibility doctrine, commonly referred to as 'opening the door,' is applied 'when one party accidentally or purposefully takes advantage of a piece of evidence that is otherwise inadmissible.'" *State v. Krueger*, 2008 WI App 162, ¶8, n.5, 314 Wis. 2d 605, 762 N.W.2d 114 (citation omitted). The purpose of the doctrine "is to 'cure' some prejudice resulting to a party as the result of the presentation by the opposing party of evidence which is inadmissible." *Bertrang v. State*, 50 Wis. 2d 702, 706, 184 N.W.2d 867 (1971). Kuchinskas's discussion of incidents that allegedly "opened the door" lacks any suggestion that the State presented inadmissible evidence.

13

> Kuchinskas therefore fails to show that the curative admissibility doctrine had any applicability. *See Krueger*, 314 Wis. 2d 605, ,18 n.5. He correspondingly fails to show that trial counsel had an obligation to invoke that doctrine. *See State v. Toliver*, 187 Wis. 2d 346, 360, 523 N.W.2d 113 (Ct. App. 1994) (counsel not ineffective for foregoing meritless arguments).

(ECF No. 1-3, ¶ 32 (footnote omitted).)

The court of appeals alternatively concluded that Kuchinskas was not prejudiced by any alleged deficiency. Counsel tried repeatedly and in a variety of ways to introduce Sabady's drug use, but the trial court consistently rejected his efforts. (ECF No. 1-3, ¶ 33.) Moreover, because Kuchinskas failed to show that Sabady's history of substance of abuse was relevant, he could not demonstrate that counsel's performance was deficient. (ECF No. 1-3, ¶ 34.)

To prevail on a claim of ineffective assistance of counsel a petitioner must show both that his attorney's performance was deficient and that he was prejudiced as a result. *Perrone v. United States*, 889 F.3d 898, 908 (7th Cir. 2018) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "On the performance prong, he 'must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009) (internal quotation marks omitted)). "On the prejudice prong, he must show that 'but for counsel's errors, there is a reasonable probability that the result would have been different.'" *Id.* (quoting *United States v. Graf*, 827 F.3d 581, 584 (7th Cir. 2016)). "As with the first prong, there is a presumption that the petitioner has not suffered prejudice." *Id.*

(citing *Graf*, 827 F.3d at 584-85). Thus, the court's review of an ineffective assistance of counsel claim is "doubly deferential" when presented in a petition for a writ of habeas corpus. *Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018) (quoting *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016)).

The court finds no error in the court of appeals' conclusion. Even if there was some other colorable argument to be made for the admission of Sabady's drug use, Kuchinskas was not prejudiced by counsel not pursuing it. As noted, Sabady's drug use was irrelevant to counts two and three and of only the most minimal relevance to count one. Even if the door had been opened, the trial court could have—and in all likelihood would have—excluded the evidence regardless of the theory under which it was presented.

Finally, Kuchinskas argues that no strategy could have justified counsel's failure to further pursue every avenue to introduce evidence of Sabady's drug use. Kuchinskas gives two reasons why Sabady's drug use was relevant. First, "[w]ithout the evidence of Sabady's drug use and O.K.'s condition at birth, the jury was left with a skewed view of the evidence -- they believed that Kuchinskas was a drug-addicted father who left Sabady as the primary caretaker." (ECF No. 14 at 2.) Second, "[s]uch evidence calls into question [Sabady's] ability to recall events and her motive for testifying in a way that could incriminate Kuchinskas, and also would establish her opportunity to harm O.K. without having the ability to recall if and when such abuse occurred." (ECF No. 2 at 14.)

15

But emphasizing Sabady's drug use would have simply created the impression that Kuchinskas left his son in the care of a drug addict. Counsel could have reasonably concluded that he did not want to create that impression. Moreover, Sabady never incriminated Kuchinskas. To the contrary, she denied ever seeing Kuchinskas do anything abusive to O.K. Arguing that drug use might have impaired her memory would suggest to the jury that maybe Kuchinskas *did* abuse O.K. but Sabady simply could not recall it.

Furthermore, Kuchinskas was a much heavier drug user than Sabady, reporting near daily use. (ECF No. 8-14 at 47-48.) Introducing evidence suggesting that drug use made it more likely someone would abuse a child would be arguably more damaging to the daily drug user than to someone who used drugs only five times over two months. Emphasizing Sabady's drug use would only encourage the prosecutor to emphasize Kuchinskas's much heavier drug use. Thus, there were obvious strategic reasons for not wanting to go down that road.

**IT IS THEREFORE RECOMMENDED** that Kuchinskas's petition for a writ of habeas corpus be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72(b)(2) whereby written objections to any recommendation herein or part thereof may

be filed within fourteen days of service of this recommendation. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 2nd day of August, 2019.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge